1 | GARY Y. LEUNG (Cal. Bar No. 302928)
Email: leungg@sec.gov
2 | DOUGLAS M. MILLER (Cal. Bar No. 240398)
Email: millerdou@sec.gov
3 | YOLANDA OCHOA (Cal. Bar No. 267993)
Email: ochoay@sec.gov
4 |
Attorneys for Plaintiff
5 | Securities and Exchange Commission
Michele Wein Layne, Regional Director
6 | Alka N. Patel, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
7 | 444 S. Flower Street, Suite 900
Los Angeles, California 90071
8 | Telephone: (323) 965-3998
Facsimile: (213) 443-1904

**FILED - GR**
January 14, 2019 2:29 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: _mkc_  SCANNED BY: _____

**1:19-mc-01**
**Ellen S. Carmody**
**U.S. Magistrate Judge**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| RALPH T. IANNELLI and ESSEX CAPITAL CORPORATION, | |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.    The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

COMPLAINT                                           1

2.    Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.    Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a) because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because defendant Ralph T. Iannelli ("Iannelli") resides in this district and defendant Essex Capital Corporation ("Essex") has its principal place of business in this district.

## SUMMARY

4.    This action arises from an $80 million offering fraud perpetrated by securities fraud recidivist Iannelli and his equipment leasing company, Essex. Between 2014 and 2017, Iannelli attracted investment through the sale of promissory notes that paid a high rate of return – typically 8.5% per annum.  Those investor returns were supposedly based on the strength of Essex's equipment leasing model, in which Essex's lease portfolio would generate sufficient income to fully offset its borrowing costs and obligations to noteholders, leaving Essex with a profit of its own.  Between 2014 and 2017, Iannelli raised over $80 million from approximately 70 promissory note investors.  Unbeknownst to the investors, however, the representations Iannelli made about their investment were materially false and misleading.

5.    Year after year, operational revenues from Essex's leasing business have comprised only a small fraction of its incoming cash flows.  The majority of Essex's funds have instead come from promissory note investors and bank loans.  For instance, between 2014 and 2016, approximately $107 million of Essex's revenue came from investors and banks and only approximately $34.4 million came from

1  equipment leasing income during that same time period. And according to its own

2  financial statements, Essex sustained a staggering $32 million in operating losses

3  from 2014 to 2016 (the company has not completed its 2017 financials). This was

4  due, in part, to Essex using the bulk of its revenues to pay back investors and banks

5  instead of using it to purchase income generating equipment. Between 2014 and

6  2016, Essex used approximately $65 million of its revenues to pay back investors and

7  banks and only approximately $39.4 million of its revenues to purchase equipment.

8  Nevertheless, Essex has taken several steps to create the illusion that its business

9  model works, allowing it to be exceedingly successful at raising money from

10  investors and bank lenders despite being unprofitable since at least 2014.

11      6.    To maintain Essex's veneer of financial success, stay current on its

12  obligations to its promissory note investors, and continue to raise new investor funds,

13  defendants: (i) resorted to a pattern and practice of making Ponzi-like payments (*i.e.*,

14  paying interest and principal owed to investors using other investors' funds) for a

15  total amount of at least $15 million since 2014; (ii) materially misrepresented Essex's

16  financial condition to a registered investment adviser whose clients eventually

17  invested more than $8 million in Essex's promissory notes; (iii) lied to another

18  registered investment adviser about the basic structure of its clients' eventual $23

19  million investment in Essex; and (iv) extended over $60 million in personal

20  guarantees on investor notes that Iannelli, given his actual net assets, had no hope of

21  being able to honor. Rather than promptly alerting investors to Essex's steep

22  financial losses, Iannelli protected only his own financial interests, by siphoning

23  millions of dollars out the company in the form of discretionary bonuses and no-

24  interest/no-maturity date personal loans to himself from 2014 to the present.

25      7.    By engaging in this conduct, Iannelli and Essex have violated the

26  antifraud provisions of Sections 17(a) of the Securities Act of 1933 ("Securities

27  Act"), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and

28  Rule 10b-5 thereunder.

8.     The SEC seeks a preliminary injunction against Iannelli and Essex prohibiting them from committing future violations.  The SEC further seeks against Iannelli and Essex an order requiring an accounting, imposing an asset freeze, and appointing a permanent receiver over Essex and all its assets.

## THE DEFENDANTS

9.     **Ralph T. Iannelli** resides in Santa Barbara, California and is the president and founder of Essex Capital Corporation.  In or about August 1974, the SEC filed a complaint against Iannelli, alleging that he violated the antifraud provisions of federal securities laws, namely Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act, by purchasing over 100,000 shares of stock for clients without their consent in order to manipulate the price of the stock.  *SEC v. Iannelli et al.,* Case No. 74-cv-3417, 1975 WL 348 (S.D.N.Y. 1975).  Iannelli consented to the entry of a permanent injunction and later to an order permanently barring him from association with any broker, dealer, investment company or investment adviser.  *Id.*  On March 31, 1976, Iannelli was convicted of criminal contempt for violating the 1974 permanent injunction to which he consented.

10.     **Essex Capital Corporation** is a California company founded by Iannelli in 1993 with its principal place of business in Santa Barbara, California.  Essex operates as a lease financing business and is wholly owned by Iannelli.  Essex is not registered with the Commission in any capacity.

## RELEVANT ENTITIES

11.     **Investment Advisor A** registered as an investment adviser firm in 2003 and is located in Santa Barbara, California.  As of December 31, 2017, Investment Advisor A had approximately 30 clients who are high net worth individuals and over $270,000,000 in assets under management.  Investment Advisor A has no disciplinary history with the SEC.

12.     **Investment Advisor B** registered as an investment adviser firm in 2014 and is located in New York City, New York.  As of December 31, 2017, Investment

Advisor B had approximately 16 clients who are high net worth individuals and over $720,000,000 in assets under management. Investment Advisor B has no disciplinary history with the SEC.

**THE FRAUDULENT SCHEME**

**A.     Essex's Purported Business Model**

13.     Iannelli has been Essex's sole shareholder and president and chief executive officer since approximately 1996. Iannelli claims that he has over 35-years of experience in the equipment leasing industry and has focused Essex's business on providing late stage startup companies with access to capital equipment.

14.     The equipment that Essex claims to lease to startup companies is specialized business essential equipment, including durable medical equipment such as wheelchairs and hospital beds.

15.     Iannelli has raised capital for Essex by soliciting his friends and members of his community, who are high net worth individuals in and around Santa Barbara, California, to invest in Essex. Some of these friends and community members referred other investors to Essex. Iannelli typically offered investors promissory notes as the investment vehicle, where the interest rate and other terms of their investments were set forth. The promissory notes that Iannelli offered investors between 2014 and 2017 typically promised investors interest of approximately 8.5 percent interest, but occasionally as high as 10 percent interest, and in or around 2011, occasionally as low as 3 percent interest. Essex's promissory notes were securities in the form of investment contracts involving the note holders' investment of money, in a common enterprise, with the expectation that returns on the notes would be derived from the efforts of Iannelli and Essex. Iannelli also raised capital for Essex by borrowing money from a local bank in Santa Barbara and at least one other financial institution and has, on at least two occasions, raised capital through soliciting registered investment advisers looking for higher yield investments for their clients.

16.     In one of its marketing materials, Essex claimed that 100 percent of investor funds would be used towards the purchase of equipment and investors would be paid back over 36 months, including their principal plus 8 percent interest.  Essex claimed it would do this by structuring the equipment lease payments so that its customers pay back the cost of the equipment over the 36 months at a fixed interest rate that can generate a total return of up to 11 percent.

17.     Essex has offered some of its investors what it referred to as "residual" payments.  According to Essex, these are the lease payments that it receives after the original lease term has expired or the payments it receives as a result of selling the equipment, which it says it typically sells for 10 to 20 percent of the original acquisition cost.

18.     Although the promissory notes generally specify a maturity date when investors can redeem their investments, Iannelli has amended several notes to add language that requires investors to provide a 90 day-notice of their intent to redeem or else their investments would automatically be "rolled over" and they would continue to receive their monthly payment amounts.

**B.     The Misappropriation of Investor Funds**

19.     By 2014, Essex was raising substantially more funds from its promissory note investors and its limited partnership investors than it was using to purchase equipment.  In 2014, Essex raised over $20 million from its promissory note investors and limited partnership investors, and borrowed an additional $6 million from banks, yet it only spent approximately $2.3 million – less than 9% – of its incoming funds to purchase equipment.  That same year, Essex spent more than $25 million of its incoming funds paying back investors and banks, and because of addition operating expenses ended up with a net operating loss of over $2 million.

20.     This trend continued in 2015 and 2016.  In 2015, Essex raised over $30 million from its promissory note investors and limited partnership investors, and borrowed an additional $13 million from banks, yet it only spent approximately $14.3

million – roughly 30% of its revenue - to purchase equipment.  That same year, Essex spent more than more than $26 million of its incoming funds paying back investors and banks, and because of additional operating expenses ended up with a net operating loss of over $7 million.

21.    In 2016, Essex again raised over $30 million from its promissory note investors and limited partnership investors, and borrowed an additional $2.8 million from banks, yet it only spent approximately $22.7 million to purchase equipment. That same year, Essex spent more than $13 million of its incoming funds paying back investors and banks, and because of additional operating expenses ended up with a net operating loss of over $22.8 million.

22.    Between 2014 and early 2017, based on bank statement analysis, Essex's main source of cash flow was the money that it received from investor-funded promissory notes and investor-funded LLCs, not the money that it received from leasing equipment.

23.    For example, in 2014, only 18 percent of Essex's cash flow (approximately $6,517,936) came from leasing income, while 65 percent of its cash flow for that same year (approximately $24,026,838) came from bank loans and investor-funded promissory notes and partnerships.

24.    In 2015, only 16 percent of Essex's cash flow (approximately $9,243,319) came from leasing income, while 79 percent of its cash flow for that same year (approximately $44,899,377) came from bank loans and investor-funded promissory notes.

25.    In 2016, only 25 percent of Essex's cash flow (approximately $17,615,342) came from leasing income, while 63 percent of its cash flow for that same year (approximately $45,165,276) came from bank loans and investor-funded promissory notes and partnerships.

26.    With leasing revenue making up such a small percentage of Essex's cash flow year-after-year, Essex could not cover the principal and interest payments that it

1  owed to its banks and investors using just the lease payments.  Instead, Essex
2  engaged in a pattern of Ponzi-like payments.

3      27.    According to Essex's financial records, including its QuickBooks
4  records, between 2014 through 2017, Essex made approximately 89 different
5  payments to existing investors using funds that it had received from its new investors
6  in an aggregate amount of about $15.6 million:

| Year | # of Ponzi-Like Payments | Total Amount of Ponzi-Like Payments |
|---|---|---|
| 2014 | 21 payments | $5.8 million |
| 2015 | 44 payments | $6.0 million |
| 2016 | 11 payments | $2.4 million |
| 2017 | 13 payments | $1.4 million |
| **TOTAL** | **89 payments** | **$15.6 million** |

17      28.    That Iannelli and Essex were engaging in a pattern and practice of
18  Ponzi-like payments in order to stay current on Essex's obligations to promissory
19  note investors – which was never disclosed by defendants to its investors – would
20  have been important to a reasonable investor when making the decision to invest in
21  Essex's promissory note instruments.

22  **C.    Essex's False Financial Statements**

23      29.    In or about June 2013, one of the banks that loaned money to Essex
24  requested Iannelli to provide the bank with Essex's financial statements.  Iannelli
25  retained an outside accounting firm to prepare Essex's financial statements.

26      30.    On or about January 2, 2014, Iannelli provided the outside accountant
27  with several documents that he knew the outside account would rely on in preparing
28  Essex's financial statements, including a Form S-1 Registration Statement for filing

1  with the SEC that erroneously indicated that Essex owned approximately 1.4 million
2  shares of a startup company that Essex had leased equipment to since 2013 ("Startup
3  Company").

4      31.    Iannelli knew, or was reckless or negligent in not knowing, that the
5  Form S-1 he provided to Essex's outside accountant vastly overstated the amount of
6  shares Essex owned in Startup Company.

7      32.    On at least three separate occasions, Iannelli received information
8  showing that Essex's shares in Startup Company were a fraction of what he had
9  reported to the outside accountant.

10      33.    On or about January 22, 2014, three weeks after he had sent the Form S-
11  1 containing erroneous information regarding Essex's ownership interest in Startup
12  Company, Iannelli received an email from Startup Company containing its
13  capitalization table, showing that Essex owned only 111,673 shares of Startup
14  Company.

15      34.    On or about February 12, 2014, at Iannelli's request, Startup Company
16  emailed Iannelli a second and updated capitalization table, showing that Essex owned
17  only 145,501 shares of Startup Company and saying that a final share calculation
18  would be sent to Iannelli within a few weeks.

19      35.    On or about March 19, 2014, Iannelli emailed a statement that he had
20  received from Startup Company's transfer agent to a brokerage firm that Essex was
21  using at the time.  The statement made it clear that Essex only owned 113,329 shares
22  of Startup Company.

23      36.    Iannelli did not furnish any of this information – the capitalization tables
24  or the transfer agent email – to the outside accountant he retained to compile Essex's
25  financial statements, and instead allowed the outside accountant to continue to rely on
26  the erroneous Form S-1 to determine the value of Essex's total assets when preparing
27  its 2014 and 2015 compiled financial statements.

28      37.    On or about February 24, 2015, the outside accountant emailed Iannelli a

1  table to review, itemizing the 2014 valuation of Essex's holdings in Startup

2  Company. The table Iannelli received from the outside accountant listed 1,394,737

3  shares of Startup Company as being "held directly" by Essex and valued them at

4  approximately $26,950,157, and listed 95,737 shares of Startup Company held in

5  Essex's brokerage accounts and valued them at approximately $1,859,596.

6        38.    Iannelli knew, or was reckless or negligent in not knowing, that neither

7  he nor Essex held any of Startup Company's shares "directly" and that Essex's only

8  shares in Startup Company at that point were those shares in Essex's brokerage

9  account.

10        39.    Iannelli did not correct the inaccuracy in the table that he received from

11  the outside accountant and instead wrote back, "Thanks and then we have [Startup

12  Company's] warrants." Nor did Iannelli correct this false information when it

13  appeared in Essex's 2014 and 2015 compiled financial statements.

14        40.    Iannelli never discussed this inaccuracy in Essex's 2014 and 2015

15  compiled financial statements ("the false financial statements") with Essex's outside

16  accountant until 2017, well after April 2016 when Iannelli "had a firm belief" that the

17  information he had provided to the outside accountant regarding the number of shares

18  Essex owned in Startup Company was "wrong."

19  **D.**    **Misrepresentations to Investment Advisor A**

20        41.    The Manager of Investment Advisor A was primarily responsible for

21  advising the clients of Investment Advisor A on their investment decisions. Since

22  approximately 2002, the Manager of Investment Advisor A has been recommending

23  Essex as an investment to clients who wanted higher yield investments, because

24  Essex offered a return of between eight and eleven percent to its investors.

25        42.    Between February 2015 and March 2017, more than 20 clients of

26  Investment Advisor A invested approximately $8.1 million in Essex promissory

27  notes. A material factor in the Manager of Investment Advisor A's decision to

28  recommend Essex as an investment to clients were the false financial statements

1   prepared by Essex's outside accountant for Essex for 2014 and 2015.

2   43.   As set forth above, the false financial statements that the Manager of

3   Investment Advisor A relied on in recommending Essex to clients was based on the

4   erroneous information that Essex owned approximately 1,394,737 shares of Startup

5   Company that were allegedly worth approximately $26,950,157.

6   44.   On or about January 22, 2015, Iannelli directed Essex's outside

7   accountant to provide the Manager of Investment Advisor A with the false financial

8   statements, as of December 31, 2013.

9   45.   Specifically, the December 31, 2013 false financial statements that the

10   Manager of Investment Advisor A received from Essex's outside accountant falsely

11   stated, among other things, that Essex's private equity holdings had an estimated fair

12   value of $56,669,907, including shares in Startup Company worth approximately

13   $31,569,000, and a subsequent event note that falsely stated that Essex had a

14   $37,174,000 ownership interest in Startup Company.  These false statements in the

15   December 31, 2013 financial statements were material to the Manager of Investment

16   Advisor A's decision to recommend, and continue to recommend, Essex as an

17   investment to clients.

18   46.   The December 31, 2013 false financial statements also incorrectly stated,

19   among other things, that Essex's assets totaled approximately $97,893,703 and that

20   its liabilities totaled approximately $82,294,959.  This was also material to the

21   Manager of Investment Advisor A's decision to recommend, and continue to

22   recommend, Essex as an investment to clients.

23   47.   As the Manager of Investment Advisor A continued to recommend

24   Essex as an investment to clients, Iannelli continued to provide, and have Essex's

25   outside accountant provide, the Manager of Investment Advisor A with the false

26   financial statements for Essex.

27   48.   On or about March 9, 2015, Iannelli directed Essex's outside accountant

28   to provide the Manager of Investment Advisor A with the false compiled financial

1 │ statements for Essex, as of September 30, 2014.

2 │     49.    The September 30, 2014 false financial statements provided to the

3 │ Manager of Investment Advisor A incorrectly stated, among other things, that

4 │ Essex's assets totaled approximately $97,365,555 and that its liabilities totaled

5 │ approximately $83,666,499. This was material to the Manager of Investment Advisor

6 │ A's decision to recommend, and continue to recommend, Essex as an investment to

7 │ clients.

8 │     50.    Unbeknownst to the Manager of Investment Advisor A, as of December

9 │ 31, 2014, Essex's assets only totaled approximately $67,466,124 and its liabilities

10 │ totaled approximately $72,785,820.

11 │     51.    Had the Manager of Investment Advisor A known this, it would have

12 │ caused the Manager of Investment Advisor A to scrutinize Essex more closely before

13 │ recommending it as an investment to clients and would have impacted the Manager

14 │ of Investment Advisor A's decision to recommend, and continue recommending,

15 │ Essex as an investment to clients.

16 │     52.    In 2016, Iannelli provided, or directed Essex's outside accountant to

17 │ provide, the Manager of Investment Advisor A with the false financial statements for

18 │ Essex, as of September 30, 2015.

19 │     53.    The September 30, 2015 false financial statements that the Manager of

20 │ Investment Advisor A received incorrectly stated, among other things, that Essex's

21 │ assets totaled approximately $123,742,107 and its liabilities totaled approximately

22 │ $107,472,624. This was material to the Manager of Investment Advisor A's decision

23 │ to recommend, and continue to recommend, Essex as an investment to clients.

24 │     54.    Unbeknownst to the Manager of Investment Advisor A, as of December

25 │ 31, 2015, Essex's assets only totaled approximately $82,652,514 and its liabilities

26 │ totaled approximately $95,014,423.

27 │     55.    Had the Manager of Investment Advisor A known this, it would have

28 │ caused the Manager of Investment Advisor A to scrutinize Essex more closely before

1  recommending it as an investment to clients and would have impacted the Manager

2  of Investment Advisor A's decision to recommend, and continue to recommend,

3  Essex as an investment to clients.

4      56.    Throughout this time period, Iannelli led the Manager of Investment

5  Advisor A to believe that the false financial statements he received for Essex were, in

6  fact, accurate.

7  **E.    Misrepresentations to Investment Advisor B**

8      57.    The General Manager of Investment Advisor B was primarily

9  responsible for advising clients of Investment Advisor B on investment decisions.

10  Between 2015 and 2016, approximately 15 clients of Investment Advisor B invested

11  in Essex and their combined investments totaled approximately $23 million.

12      58.    The clients of Investment Advisor B invested in Essex through

13  convertible promissory notes that were supposed to be converted into ownership

14  interests in two limited liability companies (LLC's).

15      59.    In or about October 2015, the General Manager of Investment Advisor B

16  began recommending Essex as an investment to clients who wanted a higher yield on

17  their investments.  Iannelli made several material false and misleading statements to

18  the General Manager of Investment Advisor B and others acting on behalf of

19  Investment Advisor B when describing how the investments would be structured and

20  how investor funds would be spent.

21      60.    Back in June 2015, Iannelli had met with the General Manager and

22  others at Investment Advisor B in New York and told them that Essex would match

23  "one-to-one" the investments that its clients made in Essex.  According to Iannelli,

24  the clients of Investment Advisor B would invest in Essex through convertible

25  promissory notes, which they would assign to one of the LLC's and, in exchange,

26  receive a 50 percent membership interest in that LLC.  At the same time, Iannelli

27  would assign to the LLC's any leases that Essex obtained using the funds the clients

28  invested, which would make the LLC's entitled to the lease payments.  When the

1    lease payments were received, Essex would receive approximately 20 percent of the

2    payments and the clients of Investment Advisor B would receive approximately 80

3    percent. The clients of Investment Advisor B would also receive all or a portion of

4    the warrants and securities issued to Essex by the lessees, and all or a portion of the

5    residual value of the leased equipment at the end of the lease term.

6        61.    After the clients of Investment Advisor B began investing in Essex,

7    Iannelli took steps to make it appear as though he and Essex were carrying out the

8    promises and representations they had made. On or about October 30, 2015, Iannelli

9    sent the Managing Member of Investment Advisor B an email stating, "The first 4

10    million was attributed to [four companies that leased equipment from Essex]" and

11    "the next two million will be for [two more companies that leased equipment from

12    Essex]."

13        62.    On or about December 21, 2015, Iannelli executed an "Assignment of

14    Equipment Leases" on behalf of Essex in which he purported to assign to one of the

15    LLC's "all right, title, and interest of [Essex] in the Equipment Lease Agreements

16    referenced on Schedule A."

17        63.    On or about April 26, 2016, after its clients had begun investing in

18    Essex, the Managing Member of Investment Advisor B sent Iannelli an email asking

19    Iannelli to confirm that Essex would still be investing "1:1 alongside us." Iannelli

20    wrote back saying, "As always we are 50/50 on each transaction."

21        64.    On or about January 14, 2017, when the General Manager of Investment

22    Advisor B asked Iannelli to send marketing materials for Essex to one of its clients,

23    Iannelli sent the General Manager of Investment Advisor B materials that stated,

24    among other things, Essex would invest "side-by-side" with its investors.

25        65.    All of these representations that Iannelli made to the General Manager

26    and others at Investment Advisor B were materially false and misleading. Iannelli

27    and Essex never matched any of the money that the clients of Investment Advisor B

28    invested in Essex. Iannelli knew, or was reckless or negligent in not knowing, that

Essex could not match those investments because Essex did not have sufficient funds to do so.

66. Iannelli never assigned the equipment leases to the two LLC's as he promised. Iannelli knew, or was reckless or negligent in not knowing, that neither he nor Essex could assign the equipment leases identified in his October 30, 2015 email to the LLC's, because Iannelli himself had already pledged those leases as the security for loans Essex had with banks. And for those leases that he had not already pledged, instead of assigning them to the LLC's as represented, Iannelli used them as collateral for still more bank loans.

67. Defendants' misrepresentations about two key aspects of Investment Advisor B's clients' investment – that Essex would match their investment dollar for dollar as well as assign the equipment leases financed by their investment to an LLC vehicle jointly-owned by those investors – were material because they concerned facts that a reasonable investor would consider important when deciding to invest. Indeed, had Investment Advisor B known that leases were not going to be assigned to the LLC vehicles, it never would have invested its clients in Essex.

**F. Misrepresentations to Investment Advisors A and B, and Other Investors**

68. Another misrepresentation that Iannelli made to the Manager and General Manager of Investment Advisors A and B, respectively, as well as to his other investors, was that Iannelli would personally guarantee their investments.

69. For example, between 2015 and 2017, Iannelli led the Manager of Investment Advisor A to believe that he had only given this personal guarantee to a few investors. Iannelli provided, or instructed Essex's outside accountant to provide, the Manager of Investment Advisor A with Essex's September 30, 2015 compiled financial statements, which falsely stated, among other things, that Iannelli had only personally guaranteed recourse notes totaling $11,514,525, as of September 30, 2015. Iannelli's representation that he would personally guarantee the investments and Essex's compiled financial statements were material to the Manager of Investment

Advisor A's decision to recommend, and continue to recommend, Essex as an investment to clients.

70.     Unbeknownst to the Manager and General Manager of Investment Advisors A and B, respectively, Iannelli personally guaranteed more than $60 million in promissory notes and debt between 2014 and 2017.  This was nearly five times greater than the value of Iannelli's personal assets at the time.

71.     Iannelli has admitted, under oath, that he "knew" he could not back up the personal guarantee he gave to the clients of Investment Advisor A and other investors, even though his investors "felt better knowing that [he] was personally guaranteeing the note."

72.     Iannelli's failure to disclose that his personal guarantee was practically meaningless, given the extent to which he had guaranteed Essex's promissory note obligations, was material because it concerned facts that a reasonable investor would consider important when deciding to invest.  Indeed, had the Manager of Investment Advisor A and General Manager of Investment Advisor B known that Iannelli could not stand behind his personal guarantee, they would not have recommended, or continue to recommend, Essex as an investment to clients.

## G.     Iannelli Profited From the Fraud

73.     Although equipment leasing – the purported core of Essex's business – had stopped being the primary source of its revenue between 2014 and 2017, Iannelli continued to siphon millions of dollars out of the company in the form of discretionary bonuses and interest-free personal loans to himself:

| Year | Description | Payment |
|------|-------------|---------|
| 2014 | Discretionary Bonus | $500,000 |
| 2014 | Loan from Essex to Iannelli | $2.1 million |
| 2015 | Discretionary Bonus | $500,000 |

| 2015 | Loan from Essex to Iannelli | $1.8 million |
|------|------------------------------|--------------|
| 2016 | Discretionary Bonus | $700,000 |
| 2016 | Loan from Essex to Iannelli | $2 million |
| **TOTAL** | | $7.6 million |

## H.  Iannelli Acted with Scienter and Negligently

74.  As set forth above, Iannelli knew, or was reckless or negligent in not knowing, that the representations he made to the Manager and General Manager of Investment Advisors A and B, as well as to other investors, regarding their investments in Essex were materially false and misleading.

75.  Iannelli knew, or was reckless or negligent in not knowing, that the Form S-1 he provided to Essex's outside accountant was false and misleading, because shortly after he provided it he received multiple emails containing capitalization tables, showing that Essex's shares in the startup company were substantially less than 1.4 million shares reflected in its Form S-1. Iannelli also received Essex's brokerage account statements and an email from Essex's transfer agent showing that the Form S-1 he provided to Essex's outside accountant was false and inaccurate, and admitted under oath that by April 2016 he had a "firm belief" that the information he had provided to the outside accountant regarding the number of shares Essex owned in the startup company was "wrong."

76.  Iannelli knew, or was reckless or negligent in not knowing, that the compiled financial statements he provided, or directed Essex's outside accountant to provide, the Manager of Investment Advisor A were false and misleading, because he had received an email from Essex's outside accountant showing that at least one of the compiled financial statements was based on the false Form S-1 Iannelli had provided, and that it falsely listed Essex's total assets as including approximately 1.4

million shares in Startup Company worth approximately $31,569,000. Iannelli did
not correct this inaccuracy in the compiled financial statements even though Essex's
outside accountant asked Iannelli to review the compiled financial statements and
Iannelli had information showing that it was false.

77.     Iannelli knew, or was reckless or negligent in not knowing, that Essex
could not match "one-to-one" the investments that Investment Advisor B's clients
made in Essex, because, as Iannelli later admitted under oath, Essex did not have
sufficient funds to match the $23 million invested by Investment Advisor B's clients.

78.     Iannelli knew, or was reckless or negligent in not knowing, that Essex
could not assign the LLC's the equipment leases identified in his October 30, 2015
email to the Managing Member of Investment Advisor B, because Iannelli had
already pledged many of those leases as security for loans he had previously taken
out with banks.

79.     Iannelli knew, or was reckless or negligent in not knowing, that he could
not fulfill his promise to personally guarantee the investments made by the clients of
Investment Advisors A and B, and the investments made by Essex's other investors,
because, in total, Iannelli had personally guaranteed more than $60 million in
promissory notes and debts between 2014 and 2017, an amount nearly five times
greater than the value of Iannelli's personal assets.

I.     **Essex Is on the Verge of Collapse and Investor Funds are at Risk of
       Dissipation**

80.     As set forth above, Essex's ability to pay back its current investors
depends almost entirely on its ability to obtain loans from banks or raise additional
funds from investors, which have been threatened by Essex's true financial condition
beginning to come to light in or about March 2017. This has left Essex on the verge
of collapse.

81.     In or about May 2017, after learning of the SEC's investigation, Iannelli
provided Essex's outside accountant with the accurate information regarding the

1 | actual number of shares it owned in Startup Company, which ultimately led the
2 | outside accountant to restate Essex's financial statements for 2014 and 2015.

3 |     82.    According to Essex's restated financial statements, in 2014, Essex
4 | operated at a net loss of $2,142,469 in 2014 and at a net loss of $7,042,213 in 2015.
5 | Essex's outside accountant also expressed "substantial doubt" about Essex's ability to
6 | continue as a going concern.  Essex's 2016 financial statements report a net loss of
7 | $22.8 million.

8 |     83.    According to Essex financial records from January 1, 2014 through
9 | March 30, 2018, Essex's debt obligation for 2017 in principal and interest owed to
10 | investors and banks totaled $40,289,130, while its revenue from lease income in 2017
11 | was just $17,969,759.

12 |     84.    According to those same financial records, Essex currently owes one of
13 | its commercial lenders $8 million, its investor-funded partnership entities $20
14 | million, and its investor-funded promissory notes $50 million.  However, Essex only
15 | has $5.9 million in unencumbered assets in its brokerage account.

16 |     85.    According to schedules produced by Essex during the SEC's
17 | investigation, Essex currently owes its promissory note investors approximately $28
18 | million, and that only represents the promissory notes that have matured, which Essex
19 | would have to repay in the near term if those investors exercised their right of
20 | redemption.

21 |     86.    In addition to being insolvent, Essex's remaining assets are at risk of
22 | being spent in a manner that gives preferential treatment to certain investors and
23 | leaves others empty-handed.  On or about November 15, 2017, Iannelli admitted that
24 | one of the ways he has been meeting Essex's obligations is by singlehandedly
25 | liquidating some of Essex's marketable securities and by using Essex's margin
26 | account collateralized by its marketable securities.

27 |     87.    Unlike the clients of Investment Advisors A and B, many of Essex's
28 | other investors are Iannelli's friends and their referrals, and Iannelli has already

1  begun using Essex's remaining assets to offer preferential payouts to those friends

2  and referrals to the detriment of Investment Advisors A and B's clients.

3  ## FIRST CLAIM FOR RELIEF

4  **Fraud in the Connection with the Purchase and Sale of Securities**

5  **Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

6  **(against All Defendants)**

7      88.    The SEC realleges and incorporates by reference paragraphs 1 through

8  87 above.

9      89.    Defendants Iannelli and Essex each defrauded investors by making false

10  and misleading statements about Essex's and Iannelli's financial condition and by

11  claiming that investor funds would be used to purchase equipment Essex was going

12  to leasing to its customers when, in fact, they knew, or were reckless or negligent in

13  not knowing, that Essex's and Iannelli's liabilities far exceeded their assets and they

14  were misappropriating and misusing investor funds to make Ponzi-like payments to

15  existing investors and for the personal benefit of Iannelli.

16      90.    By engaging in the conduct described above, defendants Iannelli and

17  Essex, and each of them, directly or indirectly, in connection with the purchase or

18  sale of a security, by the use of means or instrumentalities of interstate commerce, of

19  the mails, or of the facilities of a national securities exchange:  (a) employed devices,

20  schemes, or artifices to defraud; (b) made untrue statements of a material fact or

21  omitted to state a material fact necessary in order to make the statements made, in the

22  light of the circumstances under which they were made, not misleading; and (c)

23  engaged in acts, practices, or courses of business which operated or would operate as

24  a fraud or deceit upon other persons.

25      91.    By engaging in the conduct described above, defendants Iannelli and

26  Essex violated, and unless restrained and enjoined will continue to violate, Section

27  10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a), 10b-5(b), and

28  10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b) & 240.10b-5(c).

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a) of the Securities Act

### (against All Defendants)

92.     The SEC realleges and incorporates by reference paragraphs 1 through 87 above.

93.     Defendants Iannelli and Essex each defrauded investors through false and misleading statements about Essex's and Iannelli's financial condition and by claiming that investor funds would be used to purchase equipment Essex was going to leasing to its customers when, in fact, they knew, or were reckless or negligent in not knowing, that Essex's and Iannelli's liabilities far exceeded their assets and they were misappropriating and misusing investor funds to make Ponzi-like payments to existing investors and for the personal benefit of Iannelli.

94.     By engaging in the conduct described above, defendants Iannelli and Essex, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:  (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

95.     By engaging in the conduct described above, defendants Iannelli and Essex violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1), 77q(a)(2), & 77q(a)(3).

# **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

## **I.**

Issue findings of fact and conclusions of law that defendants Iannelli and Essex ("defendants") committed the alleged violations.

## **II.**

Issue orders, in a form consistent with Fed. R. Civ. P. 65(d), preliminarily enjoining defendants, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## **III.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining defendants, and their agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## **IV.**

Issue, in a form consistent with Fed. R. Civ. P. 65, an order freezing the assets of defendants; ordering an accounting by defendants; and appointing a permanent receiver over Essex.

## **V.**

Order defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

**VI.**

Order defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**VII.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VIII.**

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  June 5, 2018

                                    /s/ *Douglas M. Miller*
                                    GARY Y. LEUNG
                                    DOUGLAS M. MILLER
                                    YOLANDA OCHOA
                                    Attorneys for Plaintiff
                                    Securities and Exchange Commission

COMPLAINT

23



Align top of FedEx Express® shipping label here.

Align bottom of peel-and-stick airbill or pouch here.

Page 1 of 1

ORIGIN ID:
ALLEN MOTORS
865 S. FIGUEROA STREET - SUITE 2800
LOS ANGELES, CA 90017
UNITED STATES US

CAD: 112613234/WSXI3200

BILL SENDER

TO  **CLERK OF THE COURT**
**USDC, WESTERN DIST OF MICHIGAN**
**110 MICHIGAN ST NW**

**GRAND RAPIDS MI 49503**
(213) 622-5555          REF: 378224 00002-002369
PO                         DEPT

FedEx
Express

E

REL#
3785346

**MON - 14 JAN 4:30P**
** 2DAY **

TRK#
0201   **7849 1199 2959**

**SX GRRA**   MI-US  **GRR**
49503

RT **239**
FZ
8
16:30  **B**
2959
01.14

PS|Ship - FedEx Label

Jackson Business Office
Court Order Department
4000 Cooper Street
Jackson, MI 49201



U.S. POSTAGE ≫ PITNEY BOWES

ZIP 49201   $ 002.05⁰
02 4W
0000344080 JAN 11 2019

US DISTRICT COURT – GRAND RAPIDS
452 FEDERAL BUILDING
GRAND RAPIDS, MI  49503
ATTN: CASHIER